Paul W. Kisslinger
Kyle M. DeYoung
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C.  20549-5977
(202) 551-4427 (tel) (Kisslinger)
(202) 772-9292 (fax) (Kisslinger)
*kisslingerp@sec.gov*

Blaine T. Welsh
Assistant United States Attorney
Nevada Bar. No. 4790
333 Las Vegas Boulevard South, Suite 5000
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Facsimile: (702) 388-6787
*Blaine.Welsh@usdoj.gov*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA – LAS VEGAS

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | Case No. |
| **v.** | |
| **JOSEPH A. SARANELLO,** | |
| **Defendant.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows against the Defendant named above:

## <u>SUMMARY OF CASE</u>

1.      The misconduct at the heart of this case is a classic pump-and-dump scheme involving a penny stock called Rudy Nutrition ("RUNU").  Daniel "Rudy" Ruettiger – the walk-

on football player at Notre Dame who was the subject of the 1993 movie "Rudy" – founded RUNU to compete with Gatorade® in the sports drink market.  Although RUNU produced, marketed, and sold a sports drink in modest quantities, it primarily served as a vehicle for a pump-and-dump scheme that occurred between February and September 2008 and grossed over $11 million for the participants.

      2.      Joseph A. Saranello participated in this scheme.  He set up phony Panamanian companies and opened brokerage accounts that he and others used in the scheme.  He did so at the direction of Chad Smanjak, who sought to conceal his involvement in the scheme.  Saranello, Smanjak and others arranged for these companies to receive large blocks of purportedly unrestricted RUNU stock.[1]  Saranello, Smanjak and others then sold that stock to the public after participants in the scheme had artificially inflated the price and volume of RUNU stock through fraudulent touting and manipulative trading.

      3.      Saranello's conduct violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), & 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

      4.      The Commission seeks to have the Court enter a judgment permanently enjoining Defendant from violating the securities laws, requiring the payment of disgorgement, prejudgment interest, and barring Defendant from participating in future penny stock offerings.

---

[1] All of the stock issued by RUNU in this matter was legally restricted, even if the company did not attach restrictive legends to the certificates.  For that reason, the Commission uses the term "purportedly unrestricted" to describe shares of stock that the company itself described as "free trading."

## JURISDICTION

5.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a]] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

6.      The U.S. District Court for the District of Nevada – Las Vegas is a proper venue for this action because certain of the acts and transactions at issue in this action occurred in this District.  For example, RUNU was organized, and it existed, under the laws of Nevada, and its primary operations were in Las Vegas.  RUNU's CEO (Ruettiger), President (Brandonisio), and CFO (Kaplan) each lived in Las Vegas during the relevant time period.  Each of these individuals, in their capacity as members of RUNU's board of directors, signed resolutions in Las Vegas that caused RUNU to issue stock that Defendant and others subsequently sold to the public as part of the fraudulent manipulation scheme described below.  Similarly, RUNU issued false press releases described below from Las Vegas.

7.      Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communications in interstate commerce, and the mails in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANT

8.      **Joseph A. Saranello** is a resident of Silverthorne, Colorado.  Saranello is a disbarred Texas lawyer who arranged for a series of Panamanian corporations that he and others used in this scheme to obtain and sell RUNU stock.

3

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

9.      **Daniel E. Ruettiger (a.k.a. Rudy Ruettiger)** is a resident of Las Vegas, Nevada.
Ruettiger was the CEO and Secretary of RUNU as well as a Director during the relevant time
period.  The Commission previously filed an action against Ruettiger in this Court on December
16, 2012.  *See SEC v. Daniel E. Ruettiger, et al.*, Case No. 2:11-cv-2011.  Pursuant to a
settlement, the Court entered final judgment against Ruettiger on January 19, 2012.

10.     **Rocco Brandonisio (a.k.a. Rocky Brandonisio)** is a resident of Las Vegas,
Nevada.  Brandonisio was the President of RUNU and a Director during the relevant time period.
The Commission previously filed a related action against Brandonisio on December 16, 2012.
*See SEC v. Daniel E. Ruettiger, et al.*, Case No. 2:11-cv-2011.  Pursuant to a settlement, the
Court entered final judgment against Brandonisio on January 19, 2012.

11.     **Kevin S. Kaplan** is a resident of Las Vegas, Nevada.  Kaplan was the Chief
Financial Officer ("CFO") of RUNU and a Director until September 2008.  The Commission
previously filed a related action against Kaplan on December 16, 2012.  *See SEC v. Daniel E.
Ruettiger, et al.*, Case No. 2:11-cv-2011.  Pursuant to a settlement, the Court entered final
judgment against Kaplan on January 19, 2012.

12.     **Stephen DeCesare** is a resident of Las Vegas, Nevada.  DeCesare was a stock
promoter who promoted RUNU during the relevant time period.  The Commission previously
filed a related action against DeCesare on December 16, 2012.  *See SEC v. Daniel E. Ruettiger,
et al.*, Case No. 2:11-cv-2011.  Pursuant to a settlement, the Court entered final judgment against
DeCesare on January 19, 2012.

13.     **Kevin J. Quinn** is a resident of Santa Monica, California.  Quinn is a disbarred
California lawyer who, at the direction of DeCesare, arranged for RUNU to issue billions of

shares of purportedly unrestricted stock during the relevant time period.  The Commission previously filed a related action against Quinn on December 16, 2012.  *See SEC v. Daniel E. Ruettiger, et al*., Case No. 2:11-cv-2011.  Pursuant to a settlement, the Court entered final judgment against Quinn on January 19, 2012.

14.     **Gregg R. Mulholland** is a resident of Huntington Beach, California.  Mulholland was a stock promoter who promoted RUNU during the relevant time period.  The Commission previously filed a related action against Mulholland on December 16, 2012.  *See SEC v. Daniel E. Ruettiger, et al*., Case No. 2:11-cv-2011.  Pursuant to a settlement, the Court entered a judgment against Mulholland on non-monetary relief on January 19, 2012.  The Court entered a final judgment against Mulholland on September 24, 2013.

15.     **Joseph A. Padilla** is a resident of San Marcos, California.  Padilla was a registered representative at Scottsdale Capital Advisors LLC, the registered broker-dealer that handled certain accounts of Mulholland, DeCesare, Quinn, and others that sold RUNU stock in the scheme.  The Commission previously filed a related action against Padilla on December 16, 2012.  *See SEC v. Daniel E. Ruettiger, et al*., Case No. 2:11-cv-2011.  Pursuant to a settlement, the Court entered final judgment against Padilla on January 19, 2012.

16.     **Chad P. Smanjak** is a citizen of the Republic of South Africa and was a resident of Los Angeles, California during 2008.  Smanjak was a stock promoter who promoted RUNU during the relevant time period.  The Commission previously filed a related action against Smanjak on December 16, 2012.  *See SEC v. Daniel E. Ruettiger, et al*., Case No. 2:11-cv-2011.  The Court entered a judgment on non-monetary relief against Smanjak on September 24, 2013.  Pursuant to a settlement, a proposed final judgment against Smanjak is pending before the Court.

17.     **Pawel P. Dynkowski** is a citizen of Poland and a legal resident of the U.S.

During the relevant time period, Dynkowski resided in Laguna Beach, California. The
Commission sued Dynkowski for the conduct described herein in the District of Nevada – Las
Vegas on December 16, 2012. *See SEC v. Daniel E. Ruettiger, et al.*, Case No. 2:11-cv-2011.
The Court entered a judgment on non-monetary relief against Dynkowski on September 24,
2013. A motion for default final judgment against Dynkowski is pending before the Court.

18. **Andrea M. Ritchie** is a resident of San Marcos, California. Ritchie was the
registered representative at Scottsdale Capital Advisors LLC who sold RUNU stock on behalf of
Mulholland, DeCesare, Quinn and others during the scheme. Pursuant to a settlement, the Court
entered a judgment against Ritchie on non-monetary relief on January 19, 2012. The Court
entered a final judgment against Ritchie on September 24, 2013.

19. **Gary J. Yocom** is a resident of Altamonte Springs, Florida. Yocom was the
registered representative at Thomas Anthony & Associates, Inc. who sold RUNU stock on behalf
of Smanjak, Dynkowski, DeCesare and others during the second phase of the scheme. The
Commission previously filed a related action against Yocom on December 16, 2012. *See SEC v.
Daniel E. Ruettiger, et al.*, Case No. 2:11-cv-2011. Pursuant to a settlement, the Court entered
final judgment against Yocom on January 19, 2012.

20. **Mehmet Mustafoglu (a.k.a. Mike Mustafoglu)** is a resident of Beverly Hills,
California who performed certain consulting services for RUNU. Mustafoglu agreed with
DeCesare to receive RUNU stock and split the proceeds of selling it with DeCesare. The
Commission previously filed a related action against Mustafoglu on December 16, 2012. *See
SEC v. Daniel E. Ruettiger, et al.*, Case No. 2:11-cv-2011. Pursuant to a settlement, the Court
entered final judgment against Mustafoglu on January 19, 2012.

21. **Rudy Nutrition** ("RUNU") was a Nevada company based in Las Vegas. RUNU

marketed and sold a line of sports drinks.  Its common stock was registered with the Commission pursuant to Exchange Act Section 12(g) [15 U.S.C. § 78l(g)].  It was quoted on the Pink Sheets (formally known as the OTC Markets Group, Inc.) under the symbol "RUNU" until September 12, 2008, when the Commission suspended trading in the security.  *See* S.E.C. Exch. Act Rel. No. 58526 (Sept. 12, 2008).  The Commission revoked the registration of RUNU's securities on November 14, 2008 because the company was delinquent in making its periodic filings.  *See Order Making Findings and Revoking Registration of Securities Pursuant to Section 12(j) of the Securities Exchange Act of 1934 as to Rudy Nutrition*, S.E.C. Exch. Act Rel. No. 58947 (Nov. 14, 2008).  RUNU became defunct shortly thereafter.

22.     **Rudy Beverage Inc.** ("Beverage") was a private Nevada corporation that on February 11, 2008 became publicly traded after a reverse merger into a shell company named AccuPoll Holding Corp.  The merged entity was named Rudy Nutrition.  Prior to the merger, Ruettiger was a director of Beverage and Brandonisio was the President, Secretary and Treasurer.  Ruettiger and Brandonisio (as well as others) jointly owned Beverage through a partnership called Rudy Partners, Ltd.

23.     **AccuPoll Holding Corp.** ("AccuPoll") was a Nevada shell corporation that Rudy Beverage, Inc. acquired in a reverse merger and renamed Rudy Nutrition on February 11, 2008. AccuPoll was quoted on the Pink Sheets at the time of the merger.

24.     **Scottsdale Capital Advisors LLC** is a registered broker-dealer located in Scottsdale, Arizona and, during the relevant time period, Carlsbad, California.

25.     **Thomas Anthony & Associates, Inc.** ("Thomas Anthony") was a registered broker-dealer located in Winter Park, Florida.  Thomas Anthony ceased doing business in December 2008.

26.     **Global Media Partners, Inc.** is a Nevada corporation that is owned and controlled by Mulholland and Padilla.  Mulholland is the company's President, Secretary and Treasurer (according to the website of the Nevada Secretary of State).  Padilla opened and controlled the Global Media Partners brokerage account at Thomas Anthony that sold RUNU shares in the scheme.  On the account application, Padilla stated that he was the "President" of Global Media Partners and the "sole owner."

## FACTS

### Background on Rudy Beverage, Inc.

27.     The RUNU pump-and-dump scheme occurred in two rounds in 2008:  February to April, and May to September.  The scheme amassed illicit profits of more than $11 million.

28.     Rudy Beverage, Inc. ("Beverage") was a Nevada corporation that purportedly competed in the national sports drink market, with such titans as Gatorade® and vitaminwater®.  The namesake of Beverage and its principal founder was Daniel "Rudy" Ruettiger, the Notre Dame football player depicted in the 1993 film "Rudy."  Beverage allegedly marketed and sold a sports drink called "Rudy" with the tag line "Dream Big! Never Quit!"

29.     Ruettiger was the CEO of Beverage.  He and Joseph Agostino, one of his friends from Notre Dame, ran Beverage out of South Bend, Indiana until October 2007, when Rocky Brandonisio became the company's President.  Brandonisio moved the company's operations to Las Vegas (where he and Ruettiger live) and took over as the day-to-day business manager.  During this time, Beverage struggled financially, with few customers, few assets and no profits.

### Stephen DeCesare Helped the Management of Rudy Beverage Lay the Groundwork for the Scheme

30.     Stephen DeCesare became the primary organizer for the resulting pump-and-dump scheme involving RUNU stock starting in late 2007.  Ruettiger knew DeCesare from

previous business dealings and they were neighbors in Las Vegas.  DeCesare was an experienced penny stock promoter.  Ruettiger and Brandonisio gave DeCesare sufficient control of RUNU to facilitate the scheme.

31.     DeCesare's first task was to turn Beverage into a publicly traded company.  He identified a shell corporation quoted on the Pink Sheets into which Beverage could be merged. The shell was AccuPoll Holding Corporation ("AccuPoll").  DeCesare picked AccuPoll because the shell had a mechanism for creating vast quantities of purportedly unrestricted stock through the use of a convertible note.

32.     DeCesare tasked Kevin Quinn with executing the merger and working with the company's transfer agent to issue purportedly unrestricted stock.  On February 11, 2008, Beverage acquired AccuPoll in a reverse merger and then changed its name to "Rudy Nutrition." A reverse merger occurs when a private company acquires a public company (typically a shell company) in order to become publicly-traded.

33.     Quinn prepared a Form 8-K that described the merger and filed it with the Commission on February 15, 2008.  The reverse merger resulted in an entity called Rudy Partners, Ltd. holding 94.9% of RUNU's stock.  Ruettiger owned 2.45% of RUNU stock and 43.23% of Rudy Partners.

34.     Ruettiger authorized his signature to be placed electronically on the Form 8-K filing (dated February 15, 2008) that announced the merger.  Rudy Nutrition began to be quoted on the Pink Sheets on February 21, 2008 under the ticker symbol RUNU.

35.     Ruettiger was the CEO, Secretary and a Director of RUNU.  Brandonisio was the President and a Director of RUNU.  Kevin Kaplan, an acquaintance of Ruettiger, became the Chief Financial Officer and a Director of RUNU.

**The Mechanism for Issuing Billions of Purportedly**
**Unrestricted Shares of RUNU Stock**

36.     A pump-and-dump scheme normally requires that its organizers control large

quantities of purportedly unrestricted shares of the target company's common stock.   The

RUNU fraud was no exception.

37.     DeCesare put Quinn in charge of generating that stock for RUNU.  In that role,

Quinn acted as the primary liaison between RUNU and its transfer agent in Plano, Texas.

DeCesare and Gregg Mulholland provided Quinn with the names of the individuals and entities

that were supposed to receive and sell the stock during the scheme.

38.     Quinn persuaded the transfer agent to issue RUNU stock in unrestricted form by

claiming that the recipients were exercising assignments of a convertible note older than the

holding period under Commission Rule 144 [17 C.F.R. § 230.144].

39.     Specifically, Quinn told the transfer agent that:  (1) the company had issued the

convertible note in the past to an individual associated with AccuPoll Holding Corp.; (2) that

individual had assigned portions of the note to a series of entities and individuals designated by

DeCesare ("the assignees"); (3) the assignees had exercised their assigned portions of the note to

obtain the stock of RUNU; (4) the note was more than a year old; and (5) the assigned portions

of the note should be converted into unrestricted stock because the relevant holding period under

Rule 144 had elapsed.

40.     This explanation that Quinn provided to the transfer agent for RUNU was a sham

designed to evade the registration requirements of the federal securities laws.

41.     For each new issuance of stock, Quinn sent the transfer agent in authorizing

resolution of RUNU's board of directors.  The resolutions each bore the signatures of Ruettiger,

Brandonisio, and Kaplan.  The directors personally signed these resolutions early in the scheme,

but later Quinn affixed a photocopy of their signatures to the resolutions.

42.     The purpose of RUNU issuing such stock was to distribute it into the public market in violation of the federal securities laws.

43.     Using the foregoing mechanism, RUNU issued more than 3 billion shares of purportedly unrestricted common stock between February and September 2008.  In fact, the company issued so much stock that it had to increase its maximum number of authorized shares (first to a billion shares and then to five billion shares).

44.     The scheme occurred in two rounds in 2008.  The first round occurred in February to April and the second round occurred in May to September.

45.     As described below, in the first round, RUNU issued 42 million shares to entities owned by, controlled by and/or associated with Mehmet Mustafoglu (7.5 million shares), Quinn (12.75 million shares), Mulholland (17.1 million shares) and Joseph Padilla (2.85 million shares), as well as others.  The purpose of RUNU issuing such stock was to distribute it into the public market in violation of the federal securities laws.

46.     Mustafoglu had agreed to give DeCesare half of the proceeds from selling the RUNU shares in Mustafoglu's accounts.  Mustafoglu executed a power of attorney to allow Quinn to place sell orders for one of the accounts that Mustafoglu controlled.

47.     Most of the shares for Mulholland and Padilla went to entities that they owned or controlled:

| Entity | Owner | RUNU Shares Received |
|---|---|---|
| Bruin Industries Inc. | Mulholland | 2,857,143 |
| Global Media Partners Inc. | Padilla | 2,857,142 |
| Griffin Trading Co. | Mulholland | 2,857,143 |
| Serrisan Investment Holdings Inc. | Mulholland | 2,857,143 |

48.     Mulholland also directed that some of the shares be issued to entities controlled

by certain associates.

49.     Almost all of the individuals and entities receiving the RUNU stock in the first phase had an account at Scottsdale Capital Advisors LLC, which was the registered broker-dealer that subsequently sold the stock.  Andrea Ritchie was the registered representative at Scottsdale who handled the deposit and sale of these shares.

50.     Padilla had an account in the name of Global Media Partners, Inc. at Thomas Anthony & Associates Inc., which was the registered broker-dealer that handled the dump accounts in the second phase of the scheme (described below).

51.     In the second round of the scheme, most of the purportedly unregistered RUNU stock went to the following sixteen nominee entities controlled by Chad Smanjak who was engaged to manipulate RUNU's shares starting in May 2008:

| Entity | Shares Issued |
|---|---:|
| Adripaul, Inc. | 7,400,000 |
| Battle X, Inc. | 185,622,725 |
| Carlton Rowe, Inc. | 210,622,709 |
| Cordillera Capital Group, Inc. | 193,956,043 |
| Fairplay International Enterprises LLC | 50,000,000 |
| Falcon Real Estate Holdings, Inc. | 185,622,709 |
| Golden Jubilee Ventures, Inc. | 210,622,709 |
| Graysia Partners, Inc. | 210,622,709 |
| HiJinks Productions, Inc. | 2,300,000 |
| Independent Investors Group, Inc. | 210,622,709 |
| Pan American Capital Group, Inc. | 60,622,709 |
| Panama Investor Services, Inc. | 182,051,281 |
| Prime Travel Protection, Inc. | 210,622,709 |
| Stargate International, Inc. | 193,956,043 |
| Synergy Property Group, Inc. | 210,622,714 |
| XAX International Group, Inc. | 210,622,709 |
| **Total** | 2,535,890,478 |

52.     These entities were all Panamanian corporations, and their owners were

ostensibly Panamanian nationals.  In reality, Defendant Joseph Saranello, one of Smanjak's

associates, set up these companies and gave control of them to Smanjak.

53.     Smanjak directed Saranello to open brokerage and bank accounts in the name of

these entities.

54.     Saranello used a group called Panama Offshore Legal Services ("POLS"), which

is based in Panama, to incorporate these entities.  POLS enabled Saranello secretly to direct the

actions of the entities based upon instructions from Smanjak.

55.     For example, when Saranello needed documents (such as brokerage account

applications) signed by the alleged Panamanian owners of the entities, POLS obtained the

necessary signatures.  POLS also provided photocopies of the alleged owners' passports, which

Saranello supplied to various broker-dealers in the context of opening brokerage accounts.

56.     Smanjak's purpose in using these entities to receive and then sell the stock of

RUNU was to prevent clearing firms and governmental authorities from knowing that he was

responsible for the resulting selling.  Smanjak also used the entities to launder the proceeds of

the fraud through bank accounts in Panama.

57.     At Smanjak's direction, Saranello opened brokerage accounts for each of the

Panamanian entities at Thomas Anthony and Associates, a now defunct four-person broker-

dealer in Winter Park, Florida.

58.     Gary Yocom, a registered representative at Thomas Anthony, worked with

Saranello to open these accounts.  Yocom helped Saranello and Smanjak deposit large amounts

of RUNU stock in certificate form in the accounts of the entities.  Yocom subsequently sold

hundreds of millions of shares in the market at the direction of Dynkowski, Smanjak, and

Saranello.

59.     DeCesare, Smanjak, Dynkowski, and Saranello obtained the newly-issued RUNU stock described above and used it to conduct a scheme that they knew or were reckless in not knowing was fraudulent.

**Round One of the RUNU Scheme:  February – April 2008**

60.     DeCesare initially chose Gregg Mulholland to pump RUNU's stock.  DeCesare had met Mulholland in late 2007 through Joseph Padilla.  Mulholland and Padilla worked under the auspices of a company they owned together called Global Media Partners, Inc.

61.     In exchange for 20 million shares of purportedly unrestricted RUNU stock, Mulholland agreed to pump RUNU through a direct mail campaign, an email campaign, and videos posted on the internet.  In coordination with Mulholland's efforts, DeCesare helped to pump the stock by directing the false company press releases through a small public relations firm.

62.     Mulholland initiated the pump of RUNU starting in March 2008.  With assistance provided by DeCesare and the company's officers and directors, Mulholland sent out two different glossy mailers touting RUNU to more than 2 million U.S. households, neither of which adequately disclosed his compensation for doing so.

63.     The mailers stated that one of the entities controlled by Mulholland, Bruin Industries Inc., received 2,857,200 shares of legend-less RUNU stock.  The mailers did not disclose that other entities owned or controlled by Mulholland (and his associates, Individuals A and B) received more than 17 million additional shares of RUNU stock or that the stock came directly from the issuer.

64.     The mailers told prospective investors that RUNU had "partnership agreements" with two large soft drink distributors:  Canteen Franchise Group and Vistar Corporation, a

14

subsidiary of Performance Food Group Co.  These were materially false statements.

65.     Vistar and Canteen did not have any agreements with RUNU.  At most, units of Vistar and Canteen had purchased a small amount of RUNU's products; they had not entered into any partnership agreements with RUNU.

66.     During March 2008, RUNU also issued press releases about the supposed agreements with Canteen and Vistar with such headlines as "Rudy Nutrition Signs National Vending Distribution Agreement with Vistar Corporation" and "Rudy Nutrition Kicks Off Spring 2008 With Distribution via the Largest National Vending Franchise Group" (i.e., Canteen).  The press releases were materially false.  Indeed, representatives of Canteen and Vistar contacted Brandonisio to tell him that each of the respective press releases were false.

67.     RUNU repeated the false or misleading claim that it had signed a "national distribution agreement" with Vistar in its Forms 8-K and 10-K filed with the Commission respectively on February 15 and October 14, 2008.  Defendants Ruettiger and Brandonisio signed the Form 10-K, and Ruettiger signed the Form 8-K.

68.     Mulholland commissioned a resident of the United Kingdom to tout RUNU in emails sent in February, March, and May 2008 to investors who had subscribed to an internet newsletter called DoublingStocks.com.  The emails expanded upon the false or misleading statements from the mailers.  For example, the mailers claimed that "[i]n a major southwest test, Rudy outsold Gatorade® 2 to 1!"  The emails turned that claim into: "[i]n several blind taste tests, Rudy outperformed Gatorade® and Powerade® by 2:1."  These statements were materially false or misleading.

69.     Mulholland also filmed two Internet videos purporting to provide investment advice on a web site called PirateStockTV.com.  Mulholland personally appeared in the videos

and his advice for viewers was to purchase RUNU stock.  He also made at least one false statement about RUNU in the videos when he reiterated the claim about the Rudy drink beating Gatorade in taste tests.  In none of these videos did he disclose that he was being paid to promote the stock of RUNU.

70.     Mulholland's efforts, combined with the company press releases, had the predictable effect of attracting buyers to the stock of RUNU.  In less than a month, RUNU went from trading 720 shares on February 27, 2008 to trading more than 3,000,000 shares on March 24, 2008.  The price of RUNU also climbed from 25 cents per share on February 28, 2008 to $1.05 per share by March 12, 2008.

71.     After that point, the price of RUNU began a roller coaster ride as the members of the scheme sold millions of RUNU shares on the market amid their simultaneous efforts to pump the stock.

72.     By the end of April 2008, Mulholland, DeCesare (via Mustafoglu), Quinn and a related person had grossed a total of $2,657,807 from sales of RUNU stock in the various dump accounts.

73.     RUNU filed three Forms 8-K with the Commission between February and April 2008, and none of them disclosed that RUNU had issued millions of shares of legend-less stock to Mulholland, DeCesare, Quinn, and others, who promptly sold most of it.  Ruettiger signed each of these forms.

74.     RUNU finally disclosed its earlier issuance of 28.5 million shares in a Form 10-Q (signed by Ruettiger) on May 16, 2008.  That form conspicuously did not mention that RUNU had issued the 28.5 million shares without restrictive legend.

75.     If By all relevant measures, phase one of the scheme had been a success, and yet

DeCesare and the management of RUNU were upset because they had expected the scheme to provide "funding" to keep RUNU going, but it failed to do so. RUNU was mostly out of cash and running on fumes. DeCesare needed to find another source of operating capital for RUNU or it would have gone out of business. It was during his search for funding that he met Chad Smanjak and Pawel Dynkowski, and the second phase of the scheme began.

### Round Two of the RUNU Scheme:  May – September 2008

76.     In late April 2008, DeCesare approached Dynkowski and Smanjak about taking over the RUNU scheme. They were interested. Dynkowski and Smanjak had the right skills and connections to continue the RUNU scheme. Smanjak controlled a series of nominee Panamanian entities through Saranello (described above) that were ideal for dumping the RUNU stock and laundering the proceeds of the fraud. Dynkowski was an experienced trader whom the Commission had sued in Delaware in 2009 for his role in four different pump-and-dump schemes.

77.     Pawel Dynkowski and Chad Smanjak took over for Mulholland in May 2008.

78.     DeCesare told Dynkowski and Smanjak that they would need to put capital into RUNU to keep it alive. Ruettiger and Brandonisio wanted $800,000. While Smanjak and Dynkowski were not willing to pay RUNU before the second phase of the scheme began, they agreed to pay the company from the proceeds of the first set of stock sales by Smanjak's dump accounts.

79.     With that agreement between the parties, RUNU began issuing tens of millions of shares of purportedly unrestricted stock to the accounts of Panamanian entities that Saranello established at Thomas Anthony on May 8, 2008. RUNU's Form 10-Q, filed with the Commission on May 16, 2008, did not disclose the stock issued to these entities. In fact, RUNU

did not fully disclose the issuances to these entities until November 2008, when the company filed a Form 10-Q on the day that the Commission revoked the registration of RUNU's securities.

80.     Acting at the direction of Smanjak, Saranello sent RUNU $797,500 on June 18 and 20, 2008, in the form of three wire transfers from two Panamanian entities he controlled. The money was from sales of RUNU stock that Smanjak and Dynkowski directed via the Panamanian entities in May 2008, which is described in more detail below.

81.     To enable these sales to occur, Smanjak and Dynkowski began manipulating RUNU's stock on May 19, 2008 through wash sales, matched orders, and trading coordinated with false press releases to fool investors into believing that there was genuine demand for the stock.

82.     To enable these sales to occur, Smanjak and Dynkowski, on behalf of RUNU and DeCesare, began manipulating RUNU's stock on May 19, 2008 through wash sales, matched orders, and trading coordinated with false press releases to fool investors into believing that there was genuine demand for the stock.

83.     In Dynkowski's first week of trading RUNU (May 19 – 23, 2008), the stock's volume went through the roof.  The stock traded 42% more shares in those five days than it had during all of February, March, and April, when Mulholland was running the first campaign to pump RUNU.

84.     The next week, Dynkowski demanded that RUNU issue a phony press release to aid his efforts.  DeCesare and Quinn arranged for the company to do so on May 29, 2008, when it falsely told the world that it had received an $800,000 private placement from a bogus Panamanian company (created and controlled by Saranello) at almost five times the previous

day's closing price for RUNU shares.  The press release stated that RUNU intended to use the money to fund its marketing campaign.

85.     In reality, the money (which was actually in the amount of $797,500) was the payment from Dynkowski and Smanjak, described above, which they generated from the sales of unregistered shares of RUNU stock through the Panamanian entities.  RUNU used most of the money to pay off outstanding debts, including $85,750 allegedly owed to Ruettiger.

86.     Saranello knew or was reckless in not knowing that the May 29, 2008 press release was false and misleading.

87.     RUNU stock responded on the day of the May 29, 2008 press release with its highest daily volume to date, and that week the stock saw a 40% jump in aggregate volume over the previous week.  DeCesare arranged for Dynkowski to coordinate his manipulative trading with the issuance of the press release.

88.     Dynkowski consistently manipulated RUNU's stock between May 19 and August 12, 2008 to persuade the public to buy more than 700 million RUNU shares sold from dump accounts held by Panamanian companies that he, Smanjak and Saranello controlled.

89.     To accommodate Dynkowski and Smanjak's need for large quantities of newly issued (and unregistered) shares of RUNU stock, the company raised its authorized shares to 1 billion (requested on June 1, 2008 and effective July 23, 2008) and then 5 billion (requested on August 1, 2008 and effective on September 3, 2008).

90.     The second phase of the scheme involved such intense pumping and dumping of RUNU stock that its participants accounted for at least 40% of the volume on almost half of the trading days during this period.  Dynkowski and others in the scheme employed hundreds of wash sales and matched orders, and the scheme generated more than $100,000 a day in trading

profits on twenty different trading days.  At the same time, the scheme eventually drove the RUNU stock price down to less than $0.002.

91.     This round of the scheme generated more than $6.3 million of illicit profits in slightly less than three months.  The accounts of the Panamanian entities controlled by Smanjak and Saranello grossed slightly more than $6 million from selling RUNU stock.

92.     The scheme eventually ended when the Commission issued a trading suspension against RUNU on September 11, 2008 (for delinquent periodic filings).

93.     Smanjak's Panamanian entities had run out of RUNU stock to sell in August 2008.  Only a few days before the trading suspension, Quinn, DeCesare, Smanjak and others had arranged for RUNU to issue another two *billion* shares to Smanjak's Panamanian entities, which they planned to dump on the market at the end of September 2008.  They were unable to do so because of the Commission's trading suspension.

94.     At the direction of Smanjak and Saranello, Thomas Anthony, the broker-dealer servicing the dump accounts in the second phase of the scheme, wired all of the fraudulent proceeds to banks in Panama.

95.     Saranello received $60,000 for his role in the scheme.  Saranello knew or was reckless in not knowing that he was participating in a fraudulent pump-and-dump scheme.

## FIRST CLAIM

### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

96.     Paragraphs 1 – 95 are hereby incorporated by reference.

97.     Defendant Saranello knowingly or recklessly, directly or indirectly, in the offer and sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce, or by the use of the mails:

    a.  employed devices, schemes or artifices to defraud; and/or

    b.  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

98.    By engaging in the foregoing conduct, Defendant Saranello violated and, unless restrained and enjoined, will continue to violate Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM

### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) Thereunder

99.    Paragraphs 1 – 98 are hereby incorporated by reference.

100.    Defendant Saranello knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange:

    a.  employed devices, schemes or artifices to defraud; and/or

    b.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

101.    By engaging in the foregoing conduct, Defendant Saranello violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM

### Violations of Sections 5(a) and (c) of the Securities Act

102.    Paragraphs 1 – 101 are hereby incorporated by reference.

103.    As described above, Defendant Saranello directly or indirectly, by the use of the

means or instruments of transportation or communication in interstate commerce or by the use of the mails:  (a) without a registration statement in effect as to the securities, sold such securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried such securities for the purpose of sale or for delivery after sale; or (b) offered to sell or offered to buy through the use or medium of a prospectus or otherwise securities as to which a registration statement had not been filed.

104.     By engaging in the conduct described above, Defendant Saranello violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

a)   permanently enjoin Defendant Saranello from engaging in future conduct in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Securities Act Sections 5(a), 5(c), and 17(a) [15 U.S.C. §§ 77e(a), 77e(c) & 77q(a)];

b)   order Defendant Saranello to disgorge, with prejudgment interest, any ill-gotten gains;

c)   prohibit Defendant Saranello from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

d)   grant such other relief as this Court may deem just and proper.

DATED:  December 18, 2014     Respectfully submitted,


<u>Of Counsel:</u>          <u>/s Paul W. Kisslinger</u>
Scott W. Friestad        Paul W. Kisslinger
Brian O. Quinn         Kyle M. DeYoung
Antony Richard Petrilla

               Attorneys for Plaintiff
               UNITED STATES SECURITIES AND
               EXCHANGE COMMISSION
               100 F Street, N.E.
               Washington, D.C.  20549-5977
               (202) 551-4427 (tel) (Kisslinger)
               (202) 772-9292 (fax) (Kisslinger)

               <u>Local Counsel</u>:
               DANIEL G. BOGDEN
               United States Attorney
               District of Nevada

               BLAINE T. WELSH
               Assistant United States Attorney
               Nevada Bar. No. 4790
               333 Las Vegas Boulevard South
               Suite 5000
               Las Vegas, Nevada 89101
               Phone: (702) 388-6336
               Facsimile: (702) 388-6787